Good morning, Your Honors. May it please the Court, Carolyn Wiggin for Mr. Davenport. I'm from the Federal Defenders in Sacramento as well. And I'm going to try to reserve two minutes for rebuttal. Try to keep your eye on the clock. It counts down and we will try to help. Thank you very much. Your Honors, there are many issues raised in this appeal. I was going to try to focus on four of them, but I am happy to answer questions about any of them. I was going to focus on Feretta, shackling, the limits on cross-examination, and the sentencing issue. Starting with Feretta, on appeal, the government bears the burden of demonstrating that the waiver was knowing and intelligent. And this Court engages in every reasonable presumption against the waiver. Doesn't that then infringe, is, your client's Feretta rights? No, Your Honor. I understand why counsel, like, why diligent defense counsel might wish to discourage that, because we often try to talk clients out of it. But the Court has made very clear that your client does have a right to defend himself. And we sometimes overturn judgments where courts have been too stingy with the right. So how do we balance this? Well Your client was warned up one side and down the other. About the risks he was assuming. He was not a stranger to court. And he was a bright kid. Your Honor, I do agree he was told by the district judge it's almost always a bad idea for someone to represent themselves. You know, I didn't really brief too deeply the warnings about the statutory minimum and mandatory – the mandatory minimum and the max. There was actually some vagueness and confusion about that instruction. But the prong I'm focused on is understanding the nature of the charges. Now, we – we recognize defendants have a right to enter a guilty plea. But it's important to us that the judge explain the nature of the charges before they do so. So honoring a right does not mean allowing a person to exercise it without ensuring that it's a knowing and intelligent waiver of that right. And that's what I would urge the Court to uphold. And your argument is that the warning with respect to Feretta has to really be the same as the warning with respect to a guilty plea in terms of here are all the elements that have been charged. Here is what must be proved against you. You really – he's really got to have a Rule 11 colloquy for – to satisfy Feretta. I used the example of the guilty plea because Judge Bybee was pointing out that, you know, why should – if we want to honor his right to Feretta, isn't it too much to ask that he also be – we ensure that he understand the nature of the charges? But I'm not trying to argue that it's exactly the same as a guilty plea, that you have to list out all of the elements. This Court has said there aren't really magic words when it comes to – So what did the – what did the trial court do wrong? What did this Court do wrong here? What should the district court have said that the district court failed to do? What didn't your client understand that he should have understood? Well, the district court, at a minimum, should have asked on the record of the Feretta hearing, do you understand the nature of the charges that you're facing, and gotten an affirmative answer before moving on. Just a general question, the nature of the charges. How could he not have understood the charges? I mean, the guy had prior sex offender convictions. The actions here were obvious and so clearly over the top that he couldn't have failed to appreciate the seriousness of the charges he was – that he was facing. I don't dispute he knew they were serious charges. I do dispute that the nature of the charges was discussed at all on the record. The one claim that was added was the conspiracy claim. Correct. We have had some cases in which we were concerned that conspiracy in and of itself was sort of a difficult concept to understand. And have sent things back when we thought that maybe somebody didn't understand the nature of a conspiracy charge. Right. I think in Forrester, this Court said, we want to be sure that the district judge ensures the defendant has a grasp of the complexity of that charge. And here, even if we look at what the charges were on the day of the Feretta hearing, there was no query into, do you understand the grasp? Although Mr. Davenport had priors related to other issues, he had never been in a child pornography case, certainly never been in Federal court, you know, where jurisdictional issues come up that are complicated. I also would point to Harris, where a defendant who went pro se was able to cite the statute he was charged with in a motion he filed pro se, and he was able to cite that statute in a motion he filed pro se. But this Court pointed out being able to cite that statute doesn't mean you have an understanding of it. And they pointed out in Harris that the defendant raised some specious jurisdictional issues, clearly didn't really get what was happening in Federal court. Kagan, what is our standard of review here? I mean, given that the State about shackling in our circuit is a little unclear, is it nearly impossible for us to conclude the district court error was plain, if that isn't, if you agree that that's the standard of review? So moving on to the shackling, I think with Feretta, it's de novo, and the government bears the burden, and this Court engages in presumptions against waiver. Moving on to shackling, I am in the plain error world. I think that this case, this Court has held in the context of both trial and non-trial context in Federal court that shackling is not favored. This Court is not favored. Shackling being not favored is not the same as saying that this plain error, if the district court does it. Well, this Court's law is clear that it's — With what case? I'm relying on Casares here, that the record has to show that there was a reason for doing that — this, that other less restrictive alternatives would not have sufficed, and that the district judge made a reasonable and reasoned decision to shackle. Here, all we have is you're being shackled. No reasoning at all. My problem on plain error review is there's no evidence whatsoever that the jury saw the shackles or even had a very good reason to think that he was shackled. Well, Your Honor, in Casares and in other cases, this Court has said the problems with shackling are not only that it interferes with the presumption against innocence in the eyes of the jury, it also causes — it also demeans the courtroom. One party is chained to the floor, the other is not. It also causes pain, embarrassment, confusion. You can imagine in this case, Mr. Davenport had to consider that had he wanted to do a sidebar at any point, he would have had to ask the judge to empty the courtroom. So there are other problems beyond visibility to the jury with shackling. No, no, I understand that. But before your time runs, I would like you to address the cross-examination and confrontation clause question. Certainly, Your Honor. Thank you. So here we're in de novo review because Mr. Davenport tried to ask questions about Ms. Martin's history and the content of child pornography she had. Now, keep in mind, at the time of the offense, these two people had known each other over the Internet and text for two or three weeks, maybe a month. At the time they were both arrested, Ms. Martin had quite a bit of child pornography on her devices. Mr. Davenport had only the one video that Ms. Martin made. So certainly, as to the conspiracy to produce child pornography, count one, the most serious count here, Mr. Davenport would have wanted to cast doubt on her testimony that she made that video because of a request from him. Had he been able to show that she had a long-term history with child pornography, that she already had other toddler child pornography images in her possession, I think that would have cast doubt on that testimony. And what reason, if any, do we have to suspect, based on the record in front of us, that the answer, had he been permitted to ask the question, would have been favorable to him? That is to say, is there anything in the record that tells us that she, if answering truthfully, would have said, I did this on my own or some version of that? We know that she had quite a bit of child pornography when she was arrested. We know that she had sent other nude pictures of this girl she babysat over a period of years to other people she met on the internet. I think, you know, I... Were any of those pictures in which she herself was abusing the child and that that was then in the picture or in the video? Well, she sent the video issue, in this case, to one or two other people. No, I understand that, but... There's pictures of her abusing other toddlers or the toddler at issue here. Except in this case. Except in this case. But I think she admitted there were other nude pictures of the toddler that she had. Any evidence that she produced those photos before she met the defendant? It's not in the appellate record. Mr. Davenport was not really allowed to develop that. I certainly... And if... If it's retried, that would certainly be an issue. If we had found some photos that she had taken of this child before she met Davenport, how would that change the conspiracy charge? Well, the government's theory on conspiracy is that she made this because he asked her to. And she said, I really didn't want to. He kept asking. He begged me. I finally gave in. If we could show that, in fact, she had made pictures like this before... How would that change a conspiracy charge? If you could show that the pictures were preexisting, of course, that would change the conspiracy enormously. It would undermine the government's case. But if she's doing this in response to him, even if she's willingly produced these things before, how does that change a conspiracy charge? It casts doubt on the credibility of her testimony that she made it due to a request from him. She seems to have... She may have been very willing to do it. It may not have been, you know, to this master-slave relationship that they had. She may have said, sure, I'll do it. How does that change a conspiracy, though? I think it casts doubt on the very testimony. She is an impeachable witness. How would that undermine her credibility? Because then you have to question, did she actually make this because of a request from Mr. Davenport? Or was it her MO? Was she involved with lots of other people and made this video to keep them hooked? What difference does it make to the MO if she's willing to do it at somebody's request? How does that change? It casts doubt on her very testimony that it was Mr. Davenport's request that triggered the video. I don't understand. I don't understand the argument. Because if she already, before she knew him, made this type of material... Sure. But if she makes this at his request, now, if you can show that she had this preexisting on her phone and just provides it to him, I think the government's case is completely undermined. You have no such evidence. What if she makes this because this is her way of intriguing a lot of other people? She doesn't make this because of one man's request. How does that change the conspiracy? If he didn't request it, then he's not part of the conspiracy. Well, all right. There's no conspiracy. If he didn't request it, that's completely different. That's the evidence of that. Maybe I can help here. What evidence beyond her testimony do we have that he requested this? We really don't. We have a lot of evidence they talked. We have evidence that after he got it, he's like, this is great. But we don't have any evidence besides her oral testimony in court that he asked her to make it. So you're arguing, then, that this cross-examination would have undermined her testimony that he requested it. Yes. And you're trying to say the jury might well then have believed her or believed that she's lying when she says he requested it. Sure. But we have text between them in which he's telling her what to do and telling her what he intends to do with this little girl when he gets there. Your Honor, those happen after this video is sent. The question is, did he ask her to make the video? Or once she sent it to him, did he say, oh, this is her thing. I'm going to now, you know, engage with her on this topic. If you look at before the video went out, there's no text about making this video. Before your time runs out, I'd like to ask a question about sentencing. Sure. It seems to me that whether we do the guideline range for 2012 or 2016, the trial court judge under either version sentenced within the range permissible. So what difference does it make? Your Honor, this Court has held, and the Supreme Court has affirmed, that the first step of sentencing is to get to the correct guideline range. If he had used the 2012 guidelines, then I believe the government agrees with me, the offense level would have been 42. And whether she's at criminal history 4 or 5, the range is 360 to life. Here, the judge believed the guideline range was life. I could also go into why I don't think stacking was allowed here, but it's enough to say under the 2012 guidelines, he's at 360 to life. Under 2016, which was erroneously used, he's at life. That's enough to send it back. I don't think the sentence imposed was 50 years, 30 years on count one, 20 years on two, three, and four, concurrently and consecutive to one. That would have been within either guideline range, isn't that correct? Well, the way the sentencing was done in this case, all counts were grouped together under 3D1.2b. An offense level was determined based on that group. And it was determined to be 46 and then cut down to 43 under the guidelines. Had the 2012s been used, it would have been 42. Now, I understand that. I'm talking about the ultimate sentence here. The ultimate sentence, I believe, once you got to that offense level and then moved into Chapter 5, I believe 30 years was both the statutory max and the guideline max for count one, the most serious count. Then when we look at 5G1.2d, which is about can you stack or not, it says if the most adequate to punish the most serious offense, then run your sentences concurrently on accounts. If it's not, run them consecutively. I believe that 30 years would have not been more than or less than the guideline range of 360 to life. So the direction of the guidelines would have been run concurrent. Now, I understand the judge could have varied from that and not busted through any of the other stat maxes, but that would have been a variance. I think under the guidelines, 30 years is where you are. Pardon me? I understand your position. Thank you so much. Okay. Now, we've taken you over. This does happen. You wanted to save two minutes. We'll give you two minutes in rebuttal. So as you're listening to the outside, plan on two minutes. Thank you so much. Sorry. Good morning, Your Honors. Andre Espinosa for the United States. May it please the Court. Your Honors, the record here is sufficient for this Court to find that Mr. Davenport knowingly and intelligently waived his right to represent himself at the series of hearings in which his Faretta waiver was the subject of discussion. First, there's a 14-page complaint in this case that supported all of the charges that ended up in the superseding, the second superseding, excuse me, the superseding indictment in this case. Davenport's initial counsel stated to the court at a hearing where counsel sought to be relieved that he had spoken to Mr. Davenport about that lengthy complaint during approximately 20 meetings. His counsel also stated that they had a disagreement about how to defend the case, necessarily implying a discussion about the charges, the nature of the charges themselves. Your Honor, later in additional hearings, the first Faretta was March 19, 2015. The district court read the statutory titles to the defendant. Those titles are self-evident, receipt of child pornography, distribution of child pornography. This Court has held in Gerritsen that one of the considerations in determining whether a defendant understood the nature of the charges against him is the complexity or simplicity of the charge. In that same case, this Court counseled a pragmatic approach to reviewing a record for to make a determination about a defendant's knowing or intelligent waiver. Let me ask, why should we read Forrester to suggest that the complexity, conspiracy charge, subjects them to heightened Faretta requirements? For example, like in a change of plea hearing, should the district court have read the elements of the charges, or are you suggesting here it was so clear by reading the titles that that was sufficient? Your Honor, first, yes, I believe that the titles of the statutes themselves were sufficiently clear to inform the defendant of the nature of the offenses against him. However, setting that fact aside, it may have been a better practice for the district court to list the elements of each offense for the defendant or for the prosecutor to do that. But this Court has found knowing and intelligent waivers under Faretta in instances in which district courts and the prosecutor have not read the elements to defendants. Garrison cites a case that's not in the government's brief, United States v. Lopez-Osuna at 242 F. 3rd 1191 from 2001. In that case, the defendant was not advised of the elements of the offense. The district court judge asked the defendant, do you understand the elements? And the defendant responded, no. And instead of reading the elements to the defendant, the district court moved on, ultimately, the defendant was convicted on an illegal reentry charge. And on appeal, this Court found that discussions between the district court were sufficient to make a record upon which the court could find that the defendant had made a knowing and intelligent waiver and that he understood the nature of the charges against him. In that case, this Court also took into consideration consultation between the defendant and his advisory counsel, like those discussions in the record in this case. Your Honor, additionally, Forrester involves two errors in the three warnings that this Court has held should be given to defendants at Faretta hearings. The maximum penalties were not stated correctly in that case, and the elements were also not discussed. In Forrester, the Court made a point to discuss the complexity of the conspiracy charge in that case. And indeed, in that case, there were multiple charge conspiracies associated with the distribution and manufacture of methamphetamine scheme and two separate complex money-laundering conspiracy charges involving international transfers of funds for promotion of illegal activity and transfers, financial transfers of proceeds of illegal activity, none of which is self-evident by the title of the statute. Here, by stark contrast, conspiracy to produce child pornography is very clear. The defendant, in that 14-page complaint that is the initial charging document, the granular details of the transactions at issue in this case were set forth. Ms. Martin, the co-defendant, was named as a co-conspirator under a heading titled Conspirator in Connecticut. There was sufficient information in the record, and there is sufficient information for this Court to conclude that Mr. Davenport understood the nature of the charges. Let me ask you about shackling, if I may. Were you trial counsel? Yes, Your Honor. Did you ask for the shackling? No, Your Honor. That was sui sponte from the judge? Yes, Your Honor. What led the judge to do that? Your Honor, the district court in this case didn't make a record, hold a hearing, or express findings explicitly. However, this litigation unfolded under over several years. The defendant was detained as a risk of flight and a danger to the community by a magistrate judge in our district, and the pretrial services report set forth facts asserting or describing the defendant's multiple failures to appear on previous occasions. The charges in this case arose after the defendant cut an electronic monitoring band off of his ankle and fled from parole, intending, based on the record of text messages between him and his co-conspirator, to leave California to Connecticut. So your argument is, I think I can tell where you're going, that as we're trying to read the mind of the judge, he was worried about absconding from the courtroom? Well, Your Honor, not just absconding from the courtroom, but otherwise causing a disruption. There is record But so far, you're not describing anything that is going to be disruptive behavior, you've just described escaped attempts. Your Honor, in the record, there is information that Mr. Davenport had caused disruptions at the Sacramento County Jail. He asked to be moved to another jail facility, and the jail actually sent word to the district court, which is in the record, explaining that Mr. Davenport had caused disruptions in the library and elsewhere. So the district court wasn't aware? The reason I'm after this is, even though this is plain error review, this is different from your ordinary shackling case because he's representing himself. If you've got a defendant who's shackled and who's just kind of pinned down to the table, and there's a curtain in front, you don't see it, and his lawyer's behaving like a lawyer, but this one, he is his own lawyer, and he can't get up. Well, Your Honor, he was shackled to a cement-filled bucket underneath counsel's table. There were black skirts around the table. I think you're confirming that he can't get up. He's got to sit there. He could stand. Both sides could stand. Okay, he can stand, but he can't do the ordinary things. For example, sidebars are really tough. He can't approach the witness. He's got to stay there. Now, it may be on plain error review we've got to leave it alone, but this is a shackling case. That's correct, Your Honor, and I'll note that the district court did take pains to equalize or address any perceived imbalances. I saw that. Requiring government counsel to stay at the table and said at the outset there would be no sidebars and that all matters that should be addressed outside the presence of the jury would happen during breaks. So the district court was careful to consider the impact of the shackling, which indicates that he had thought carefully about his reasons for imposing it. Your Honor, no. He indicated he thought carefully about the result of imposing it. That's right, Your Honor. I will note in Kazar, as the case that Davenport relies on, there was no hearing. There were no explicit findings. The shackling was more extensive than the shackling here. And despite those facts, this Court did not find a violation of due process. On the question of confrontation, it does seem to me that Mr. Davenport was trying to figure out a way to show that she was lying with respect to whether he had requested her to do that. And one of the ways to get at that is, okay, what's your history with this? That line of questioning was cut off. How do you justify that? Is it not a violation of the Confrontation Clause? Or if a violation, harmless? I mean, what's your argument? Well, Your Honor, it's our position that it's not a violation of the Conference Clause for several reasons. First, the specific questions at issue illuminate sort of the discussion here. Question one was, approximately how long have you been involved in CP? And question two was, did you have any other photos or videos of CP-involving toddlers? First, with respect to question two, there was evidence in the record, both from Martin's cross-examination and direct examination, and the examination of law enforcement witnesses who analyzed her phone, about the collection of child So if we knew information, then why was there a problem in allowing Davenport to explore this? Well, Your Honor, I — my — at trial, the government's objection related to the fact that this area had been developed on direct examination and by examination of other witnesses. Which means the door had been opened. So usually that means that you get to cross-examine people about it. Well, even if there — it was error to not permit Davenport to inquire into those areas, this Court makes clear that a number of factors go into the determination of whether the error was harmless. In this case, one of those — one of those factors includes the extent of cross-otherwise allowed and the overall strength of the government case. In this case, cross-examination about Ms. Martin's production of the video and her email address with the term P-U-C-C-A, PUCA, in it. Ms. Martin was questioned both on direct and cross about sending the video to this PUCA individual. She admitted that she did send the video to that person. She admitted that she sent other videos to other people and that she sent other images to other people. She admitted that she had been in BDSM relationships like the one she was in with Mr. Davenport with many other individuals at the time, and that she had communicated with thousands of other people on social media. But the question is not that she's been doing other things, but the immediate question in front of — that I've got in my head is the conspiracy question. Was she lying when she said, he asked me to do it? What evidence do we have in the record that he asked her to do it besides her testimony? Besides Ms. Martin's testimony, there is — there are text messages, contemporaneous text messages and phone calls. And what did those messages say? So first, the phone logs back up her testimony that Mr. Davenport made the specific request for a penetration and oral video. With the phone records, how do they back it up? The fact that there was a phone call made? Yes. But there's no transcript of what is said? That's correct. There's no content in the record about the calls, but Ms. Martin testified about the calls and there's records showing the calls existed. But no, please stay with my question. What other than her testimony tells us that he asked her to do this? So in addition to those phone logs, there are the text messages. During the period — And what do those text messages say? Well, there's a long series of messages. Overall, there's about 900 messages. But on the day, August 27th, the day that the video is made, there are a series of messages in which Mr. Davenport berates Ms. Martin, says that she's not being a faithful slave, she's not doing what he asked her to do. He asks her why she won't serve her master better. And then he demands that she call him at the time that the call — that the call logs reflect occurred. That's the day of the video's creation, approximately three hours before the video was created. There's a 45-minute call. Martin says what she says about Davenport instructing her to make the call. And then there are a series of 42, approximately 42, text messages between 1.30 p.m. and 4.30 p.m., approximately 6.30 p.m., in which Martin and Davenport exchange text messages, in which Davenport's clearly expecting the arrival of something that is 10 megabytes. Okay. That finally gets what I need. Okay. When it arrives, he says, I love it. She says, I hope you like it. He says, I love it. And then he instructs her further. Go back, trim your fingernails, and do it again. And on the same date range in the conspiracy, he also says, when are you going to send me images of the older sister? I want to see her as well. Got it. Okay. Counsel, I'd like you to turn to the sentencing question. And here is my specific question. In the PSR, the revised PSR, at page, let's see, page 5, there's a paragraph that says that the Probation Office suggests that the 2011 conviction in California does not qualify as sex abuse crime against a minor. And therefore, the enhanced sentencing penalties are not warranted. And the pre-sentence report has been revised. It appears that it wasn't revised. And there are additional places where the 2011 California conviction is cited as qualifying sex abuse of a minor. So it appears that the PSR says, we made a mistake in the first one, we shouldn't have counted it, and it looks like the error wasn't corrected and that they did count it. So now what do we do? Your Honor, that underlying conviction is a potential basis for application of the 4B1.5 repeat and dangerous sex offender enhancement, which the Court applied here. The effect of that enhancement was to raise the criminal history category from 4 to 5 in this case. As the Court's already noted, the sentencing range wasn't affected by that increase in the criminal history category. It was life under either outcome. But the PSR says, we made a mistake, we shouldn't have counted it, and then it goes ahead and counts it anyway. It looks like it didn't. It looks like they just didn't make the conforming change later when they did the actual calculations. And it doesn't look like the district court or the government or defense or the defense ever saw the problem. So we started from the wrong we've got the wrong calculations then from the beginning. Part of that may have arisen from the government's initial position that the internal conviction, the 2011 California conviction, in our original sentencing memo, we argued that that indeed was the case and that those sentencing escalators applied. After review and further consideration, the government backed away from that position and filed an amended sentencing memo in which the government took the position that those that that underlying conviction may not have triggered those enhancements and that the court could reach the sentence, the appropriate sentence of 600 months by imposing consecutive terms. Okay. So, I mean, this is sort of then the same colloquy that we were having with defense counsel, that it just changes it from 360 to life instead of life. That's right. And so the sentence is still lawful, but the government is conceding that the court started from the wrong premise. You're right, Your Honor. The calculation itself should not have included, likely should not have included 4B1.5, but the outcome would have been the same in either way. The district court made that clear. But under our case law in sentencing, doesn't that almost automatically mean we send it back for resentencing so that the judge has in front of him the appropriate guideline? Under normal circumstances, that may be appropriate. But in this case, there's no — there was no prejudice to Mr. Davenport's substantial rights. That is, the district court made clear in his 3553A analysis that he intended to impose a sentence that would protect the public to the extent the court had power to protect it. The district court made clear that he thought a sentence of 600 months was the only sentence that would adequately advance the 3553A factors and protect the public in this case. Okay. So the result may have been the same. It likely would have been the same. Thank you, Your Honors. Would you please put two minutes back on the clock? Thank you. For Ms. Wiggins. Thank you so much. Thank you, Your Honors. I just want to touch on a few things my colleague said. As to the Feretta warnings, there was a complaint that the first counsel appointed said that he read to Mr. Davenport. There were 20 meetings, but there was no evidence on the record that Mr. Davenport's initial attorney or Mr. Davenport ever said Mr. Davenport understood the charges. I think this Court has said the district court should make a record at these Feretta proceedings that there's an understanding of the charges, and we don't have that because we don't know what the content of those meetings were. I disagree that the title of these charges makes it clear what they contain. I think especially conspiracy to produce child pornography, it's not obvious that when you're 3,000 miles away and somebody else is taking all of the actions, how you're going to become liable just from hearing conspiracy to produce. So I think that there had to be a deeper understanding on the record. On the shackling, Mr. Davenport did have a failure to appear about 15 years before the trial for a misdemeanor proceeding in L.A. I don't think there's any evidence that that was the reason the district judge shackled him in this case. He was detained at the Sacramento County Jail throughout the proceedings. Before he was brought into court, he was in a holding cell. There are always marshals in the courtroom. There's no evidence that he was chained because the district court was afraid he was going to run away from court. He had never done anything like that. He could be verbally difficult, but he had never done anything that would suggest violence in the courtroom or violence, really, even at the jail. Although he was verbally annoying, that's not a reason to shackle someone. And as far as whether the fact that the jury didn't see the shackles, you know, from what we can tell from the record, matters, I was rereading a case, Duckett, and it's in my briefs the other night. And in that case, someone is brought in front of — it's a death penalty case. The person has been convicted. You're over your two minutes, so if you could wrap up with this. Okay. So it just goes to there's more than just the jury seeing the shackles at issue and shackling. On cross-examination, there was — there was evidence she had other child pornography. There was no evidence she had other images of toddlers. So that's something Mr. Davenport should have been able to go into. Sentencing, Your Honors, the — I think — I think we understand the sentencing. Okay. Thank you so much. Thank you. I appreciate it. Thank both sides for their arguments. The case of United States v. Davenport submitted for decision.
judges: D.W. Nelson, W. Fletcher, Bybee